1
2
3
4                      **UNITED STATES DISTRICT COURT**

5                        **DISTRICT OF NEVADA**

6                            \* \* \*

| | |
|---|---|
| TATUO MARTINSON, | Case No. 2:25-cv-01376-RFB-DJA |
|         Plaintiff, | **ORDER** |
|    v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
|         Defendant. | |

       Before the Court for consideration is Plaintiff Tatuo Martinson's (ECF No. 8) Motion for a Temporary Restraining Order or Preliminary Injunction, and two (ECF Nos. 23, 25) Motions for Leave to file supplemental authority relevant to that Motion, by Defendant National Collegiate Athletic Association and Plaintiff Martinson respectively. This Order grants the Motions for Leave and sets forth in detail the Court's findings and reasoning for granting Plaintiff preliminary injunctive relief.

## I.     INTRODUCTION

       This case is one of a multitude of pending nationwide antitrust challenges to the National Collegiate Athletic Association's ("NCAA") so-called "Five-Year Rule," an eligibility rule which restricts the number of seasons student-athletes who attended a junior college ("JUCO") are eligible to compete in NCAA Division I athletics to a maximum of two or three seasons, while student-athletes who enroll directly in a Division I institution are entitled to four seasons. This Court finds that Five-Year Rule is likely an undue restraint on trade imposed by the

NCAA's monopsony power over the rapidly transforming labor market for competitive college football services.

As such, this Court finds that Tatuo Martinson, who would have lost his spot as a defensive lineman on the University of Nevada, Las Vegas (UNLV)'s football team for the upcoming season, and with it, time-sensitive, unparalleled, and incalculable career opportunities, solely due to the NCAA's application of the Five-Year Rule to disqualify him and other similarly situated former JUCO athletes, has shown he would suffer an immediate and irreparable antitrust harm in the absence of preliminary injunctive relief. Thus, as explained in detail below, after carefully considering the Parties' arguments and the record, this Court found and finds that the <u>Winter</u> factors weigh strongly in Martinson's favor and enjoined the NCAA from enforcing the Five-Year Rule to disqualify him for the 2025-2026 Division I football season.

## II.    PROCEDURAL HISTORY

On July 30, 2025, Plaintiff Martinson filed his Complaint for declaratory and injunctive relief and damages against the NCAA, bringing claims for violation of Section I of the Sherman Antitrust Act and breach of contract. <u>See</u> ECF No. 1. On August 1, 2025, Martinson filed the instant Motion for a Temporary Restraining Order or Preliminary Injunction. ECF No. 8. On August 3, 2025, finding the Motion warranted consideration on an expedited basis, the Court ordered service on the NCAA and set a briefing schedule. ECF No. 9. On August 12, 2025, the NCAA filed its Opposition, and on August 18, 2025, Martinson filed his Reply. ECF Nos. 14, 21. On August 19, 2025, the NCAA filed the instant Motion for Leave to file supplemental authority in support of its Opposition. ECF No. 23. On August 20, 2025, Plaintiff filed the instant Motion for Leave to file supplemental authority in support of his Motion for Preliminary Injunction. ECF No. 25. Also on August 20, 2025, the Court held a hearing on the Motion for Preliminary Injunction, and based on the representation of Plaintiff's counsel that UNLV would only be able to hold Martinson's spot on its football team for the next day or two, entered a Minute Order granting the preliminary injunction, with this full written order to follow. ECF No.

1    26.

2

3    **III.    LEGAL STANDARDS**

4        **A.  Motion for Preliminary Injunction**

5        A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

6    clear showing that the plaintiff is entitled to such relief." <u>Winter v. Nat. Res. Def. Council, Inc.</u>,

7    550 U.S. 7, 22 (2008). A party seeking preliminary injunctive relief must make a "clear

8    showing" that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in

9    the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an

10   injunction is in the public interest. <u>Id.</u> at 7, 20, 22. Courts in the Ninth Circuit evaluate "these

11   factors on a sliding scale, such that a stronger showing of one element may offset a weaker

12   showing of another." <u>Recycle for Change v. City of Oakland</u>, 856 F.3d 666, 669 (9th Cir. 2017).

13       Most preliminary injunctions are prohibitory; they prohibit a party from taking action and

14   "preserve the status quo pending a determination of the action on the merits." <u>Marlyn</u>

15   <u>Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 878-79 (9th Cir. 2009)

16   (quoting <u>Chalk v. U.S. Dist. Court</u>, 840 F.2d 701, 704 (9th Cir. 1988)). A mandatory injunction,

17   by contrast, "orders a responsible party to 'take action.'" <u>Id.</u> at 879 (citing <u>Meghrig v. KFC W.,</u>

18   <u>Inc.</u>, 516 U.S. 479, 484 (1996). The distinction is legally significant because generally,

19   "mandatory injunctions are not granted unless extreme or very serious damage will result and are

20   not issued in doubtful cases or where the injury complained of is capable of compensation in

21   damages." <u>Marlyn Nutraceuticals</u>, 571 F.3d at 879 (citations omitted). A plaintiff seeking a

22   mandatory injunction must establish that the law and facts "clearly favor" their position, not

23   simply that they are likely to succeed. <u>LA Alliance for Human Rights v. County of Los Angeles</u>,

24   14 F.4h 947, 956 (9th Cir. 2021).

25       **B.  Section I of the Sherman Antitrust Act and the Rule of Reason**

26       The Sherman Antitrust Act prohibits "contract[s], combination[s], or conspirac[ies] in

27   restraint of trade or commerce." <u>NCAA v. Alston</u>, 594 U.S. 69, 80 (2021) (citing 15 U.S.C. § 1).

28   The phrase "restraint of trade" means "undue restraint." <u>Id.</u> at 81 (citing <u>Ohio v. Am. Express</u>

Co., 585 U.S. 529, 540 (2018). Determining whether a restraint is undue "presumptively calls for what [the Supreme Court has] described as 'a rule of reason analysis,'" id. (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006); Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 60-62 (1911)), "which requires a court to 'conduct a fact-specific assessment of market power and market structure' to asses a challenged restraint's 'actual effect on competition'" in an effort to "to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Id. (quoting American Express, 585 U.S. at 542). Most restraints challenged under the Sherman Act are subject to the rule of reason. Id. at 88.

An antirust analysis under the rule of reason employs "a three-step, burden-shifting framework." Id. at 96. First, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Id. If the plaintiff carries that burden, the burden "then shifts to the defendant to show a procompetitive rationale for the restraint. Id. "If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." Id. at 97 (citation and quotation marks omitted).

### IV.    FACTUAL BACKGROUND

The Court makes the following findings of fact based on the allegations in Martinson's Complaint, his declaration, and other evidence in the record submitted by the Parties in briefing Martinson's Motion for preliminary injunctive relief.

#### A.  The NCAA and the Division I "Five-Year Rule"

The NCAA is an unincorporated association that governs almost all college athletics nationwide, and includes over 1,100-member collegiate institutions, with more than 350 Division I member schools and over 200,000 Division I student-athletes across those member schools. Through its Constitution and Bylaws, including the specific Division I Bylaws at issue in this case, the NCAA's rules regulate many aspects of college sports. These rules are enacted and amended by votes of the member institutions and their governing councils.

The NCAA's Division I Bylaws include the so-called "Five-Year Rule," which provides "[a] student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" within "five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution . . ." NCAA Bylaws 12.8, 12.8.1. Time spent in "the armed services, on official religious missions or with recognized foreign aid services of the U.S. government" are not counted towards this five-year clock. NCAA Bylaw 12.8.1. Otherwise, the clock starts ticking when a "student-athlete initially registers in a regular term" at a "collegiate institution" which is defined to include any institution accredited at the college level or that conducts an "intercollegiate athletics program" and is "authorized to offer at least a one-year program of study creditable toward a degree." NCAA Bylaws 12.8.1.1, 14.02.04.

"Intercollegiate competition" includes competition at two-year or four-year institutions, including those that are underlined not members of the NCAA. NCAA Bylaw 12.02.6. Accordingly, a student-athlete who enrolls in and plays football at a two-year junior college ("JUCO") will have the years enrolled and seasons played at a JUCO counted towards the four seasons within five-years of eligibility to play football at a NCAA Division I institution. This is the case even though JUCOs (or any other two-year institution) are not and cannot be members of the NCAA.

In addition to the exceptions for military, religious, and foreign-aid service, there are numerous other exceptions which lead to the uneven enforcement of the Five-Year Rule. For example, a student who graduates high school and plays football at a prep school for a post-graduate year, and subsequently enrolls in a NCAA member institution, will receive five years of eligibility to play four seasons of football. This is the case even if that student competed with athletes at a JUCO institution during his time competing for the college prep school. Additionally, a student can graduate high school and have a multi-year career as a professional athlete in a different sport, and then enroll in a NCAA Division I institution, and still have four seasons within five years of eligibility, even if that results in a 30-year-old student-athlete

competing with 18-year-old athletes.[1]

The NCAA also allows for both blanket and individualized waivers of the Five-Year Rule. Bylaws 12.8.1.7.1(a)-(b) provide for waivers when the student-athlete was "deprived of the opportunity to participate in intercollegiate competition" in more than one season due to circumstances "beyond the control of the student-athlete or institution." The NCAA Division I Board of Directors also approved a waiver permitting member institutions to self-apply a waiver for a season-of-competition and one year extension to account for the impacts of the COVID-19 pandemic on the 2020-2021 season. And after the federal court decision in Pavia v. NCAA, Civ. No. 24-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024) to grant a preliminary injunction prohibiting the NCAA from counting a year that the plaintiff Pavia competed at a JUCO institution to bar him from competing in his fourth season of Division I competition at Vanderbilt University, the Division I Board of Directors granted a waiver to all students similarly situated. This waiver grants an additional season of competition to former-JUCO athletes only if they have not exhausted the five-year eligibility clock.

### i. *The Rule of Restitution*

NCAA Division I Bylaw 12.11.42, the Rule of Restitution, states:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions. . .

Potential punishments include vacating wins, post-season bans, ordering return of television

---

[1] Martinson illustrates this with examples including Chris Weinke, who enrolled in Florida State University as a freshman following a six-year professional baseball career and proceeded to win the Heisman trophy for playing college football at 28 years of age. ECF No. 8-1 at 7. Martinson also points to Monte Harrison, a 30-year-old sophomore on University of Arkansas football roster for the upcoming season, who graduated high school in 2014 and played professional baseball for several years. Id.

revenue, and other financial penalties.

### B. Plaintiff Martinson's College Football Career

Plaintiff Tatuo Martinson is a defensive lineman on UNLV's football team. UNLV is a NCAA Division I member. After graduating high school, Martinson was recruited and enrolled in American River College ("ARC"), a two-year JUCO, from 2019-2021. During that period, he played football for two full seasons, not including the 2020 season, which was postponed due to the COVID-19 pandemic. In 2021, after playing his second season, Martinson was offered and accepted a "walk-on" position to play Division I football at UNLV. During the 2022 season, Martinson "red-shirted" under NCAA Bylaw 12.8.3.1.6, which allows football players to play up to four games per season without losing a season of eligibility. In 2023 and 2024, Martinson competed for two full seasons as a defensive tackle and "walk-in" player on UNLV's football team and earned a full athletic scholarship to obtain his master's degree and play for the 2025-2026 season. However, he was declared ineligible by the NCAA pursuant to the Five-Year Rule.[2] UNLV filed a waiver request with the NCAA on Martinson's behalf, which the NCAA denied on May 8, 2025. UNLV appealed the decision, but it was upheld on July 14, 2025. Since being declared ineligible, Martinson lost one NIL opportunity for a video game that was contingent on his eligibility for the 2025-2026 season.

### C. The Current Market Realities of Competitive College Football

In the landmark 2021 decision in <u>Alston</u>, the Supreme Court unanimously affirmed the district court's finding that NCAA Bylaws prohibiting compensation for student-athletes violated Section I of the Sherman Act, and that the nature of collegiate sports as amateur could not entitle the NCAA to any judicially ordained immunity from antitrust scrutiny under the Sherman Act. <u>Natl. Collegiate Athletic Assn. v. Alston</u>, 594 U.S. 69, 93-94 (2021). The decision reflected the vastly expanded commercial market for college sports—for example, in the early 1980s, CBS

---

[2] Due to the COVID-19 waiver, Martinson exhausted his five years of eligibility from 2019-2024, with 2020 being excepted. Additionally, the two seasons Martinson competed in at ARC counted towards his four seasons of eligibility, while he has only competed in two full seasons of Division I football.

Broadcasting Inc. paid $16 million per year to televise Division I men's basketball events, whereas in 2016 that number was $1.1 billion. Within that market, Alston described the NCAA as a "sprawling enterprise" that generates billions in yearly revenue. Id. at 69. After Alston, the NCAA lifted its prohibition on student-athletes receiving compensation for the use of their name, image, and likeness. And in the four years since, the market for NIL deals available to Division I athletes exploded, with the 2024 NIL market valued at $1.1 billion. ECF No. 8-4 at 5. Only about 0.6 % of that market goes to college football players outside of NCAA Division I institutions. Id. Typically, and importantly, NIL deals had until recently come from entities or groups which were separate from the Division I institutions themselves. That is to say that the Division I institutions were not directly paying student athletes.

The NCAA had until recently distinguished itself and its product—competitive college sporting events—by highlighting the fact that its athletes were amateurs and not paid athletes, such as those in the National Football League ("NFL") or the National Basketball League ("NBA"). This all changed on July 1, 2025. Specifically, the NCAA voluntarily decided to alter its current rules and will now allow NCAA college athletes to be **paid directly** by Division I institutions. The NCAA's decision arose from the settlement of a pending federal case. See In re Coll. Athlete NIL Litig., No. 20-CV-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025). The class action settlement approved by a federal judge, which became effective on July 1, allows signatory Division I institutions to pay their athletes up to $20.5 million per academic year through a revenue sharing model, with planned increases for the next ten years, which cumulatively would allow for direct compensation and benefits to student-athletes estimated to ultimately total at least $19.4 billion over the ten-year period. See id. at *7. UNLV is a signatory to the settlement agreement.[3]

The settlement also awards $2.576 billion in damages for members of the class who

---

[3] Mark Morales Smith, UNLV opts in to House v. NCAA Settlement, Will Begin Paying Student-Athletes, Sports Illustrated (Jun. 10, 2025), https://www.si.com/college/unlv/latest-news/unlv-opts-in-to-house-v-ncaa-settlement-will-begin-paying-student-athletes [https://perma.cc/7BW9-MA8P].

competed in Division I but were unable to receive compensation for use of their NIL and athletic services. Id. at *5. It also removes limitations on athletic scholarships and permits the NCAA to adopt roster limits for Division I sports. Id. at *8. Taken together, the forward-looking remedies are estimated, in the aggregate, to amount to approximately $1.6 billion in new compensation and benefits per year available to Division I athletes, with that amount increasing over the next ten years. Id. at *1.

## V.   DISCUSSION

### A.  Supplemental Authority

First, the Court finds good cause exists to grant leave to both the NCAA and Plaintiff to file supplemental authority, because both decisions are directly relevant to the issues in this case and were issued after the parties' briefing deadlines passed. See LR 7-2(g) (providing a party must obtain leave to file supplemental authorities).

### B.  Mandatory v. Prohibitive Injunction

As an initial matter, the NCAA asserts that Martinson seeks a mandatory injunction. But the Court finds the nature of the requested relief here is somewhat of a hybrid between mandatory and prohibitive. To determine whether requested injunctive relief is mandatory or prohibitive in nature, the Court must determine whether it preserves the *status quo*. The relevant *status quo* is "the last uncontested status that preceded the parties' controversy." Dept. of Parks & Recreation for State of Cal. v. Bazaar del Mundo, 448 F.3d 1118, 1124 (9th Cir. 2006). the *status quo* is defined as "the legally relevant relationship between the parties before the controversy arose." Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 82 F.4th 664, 684-85 (9th Cir. 2023). And, as the Ninth Circuit clarified, noting that the distinction between prohibitive or mandatory relief can sometimes be ambiguous, "[t]he distinction between the two types of injunctions can fairly be categorized as one of action versus inaction." Id. (citing Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1060 (9th Cir. 2014)).

Here, under the existing NCAA Five-Year Rule, Martinson is ineligible to play in the 2025-2026 season, and that rule has existed since Martinson first began playing Division I

football—so by enjoining the enforcement of that rule, the injunction alters the *status quo*. On the other hand, the relief requested does not require the NCAA to take affirmative action; rather, it *prohibits* the NCAA from preventing UNLV from keeping Martinson on its roster for the 2025-2026 season. And given that the NCAA has already been enjoined from enforcing the rule against other athletes and voluntarily created a blanket waiver for the four-seasons rule as applied to JUCO athletes, it is difficult to see what "affirmative action" the injunction here would require the NCAA to take. Accordingly, although the Court finds Martinson satisfies the standard for a mandatory injunction because the law and facts "clearly favor" his position, it is not clear that the standard should be as exacting as NCAA argues. Alliance for Human Rights, 14 F.4th 947, 956 (9th Cir. 2021).

The Court now address each Winter factor in turn.

### C. Likelihood of Success on the Merits

First, the Court finds Plaintiff has satisfied the most important Winter factor: he is likely to succeed on the merits of his antitrust challenge to the NCAA's five-year eligibility rule under Section I of the Sherman Antitrust Act. Matsumoto v. Labrador, 122 F.4th 787, 804 (9th Cir. 2024) (Likelihood of success on the merits is the most important factor in a preliminary injunction analysis).

### i. *The Five-Year Rule is Commercial*

The NCAA argues the Ninth Circuit's distinction in O'Bannon between unlawful NCAA restrictions on compensation versus rules "limiting the number of years that student athletes may play collegiate sports" requires a finding that the Five-Year Rule is a "true eligibility rule" that is non-commercial and therefore beyond the scope of the Antitrust Act. O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049, 1066 (9th Cir. 2015). Several courts have accepted this argument, finding Alston did not abrogate O'Bannon. See e.g., Giles v. Nat'l Collegiate Athletic Ass'n, No. 2:25-CV-06454-JVS-KES, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025); Hasz v. Nat'l Collegiate Athletic Ass'n, No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025); Johnson v. Nat'l Collegiate Athletic Ass'n., No. CV 25-60-M-KLD, 2025 WL 1790345 (D. Mont. June 26, 2025); Coley v. Nat'l Collegiate Athletic Ass'n, No. 5:25-CV-98-D, 2025 WL

1616719 (E.D.N.C. June 6, 2025); <u>Brzovic v. Nat'l Collegiate Athletic Ass'n.</u>, No. 2:25-CV-02885-DCN, 2025 WL 1370758 (D.S.C. May 11, 2025). However, this Court disagrees and finds that the analysis of the NCAA Bylaws in both <u>O'Bannon</u> and <u>Alston</u> did not and could not account for how the market for unrestricted NIL compensation has exploded since <u>Alston</u>, and even more significantly, the fact that NCAA members can now directly pay student-athletes for their services. The market now is effectively a *labor market* for competitive college football services.

Considering these drastic changes post-<u>Alston</u>, the notion that any of the NCAA's restrictions on eligibility, which now directly determine the ability of Division I athletes to participate in the labor market for college athletic services and be compensated for their labor, can be characterized as non-commercial is untenable. <u>See e.g.</u>, <u>Braham v. Nat'l Collegiate Athletic Ass'n</u>, No. 3:25-CV-00253-MMD-CSD, 2025 WL 2017162 at *5 (D. Nev. July 18, 2025) (finding the current market for NIL compensation within Division I athletics rendered the Ninth Circuit's classification of NCAA eligibility rules as "noncommercial" moot); <u>Robinson v. Nat'l Collegiate Athletic Ass'n</u>, No. 1:25-cv-00075-JPB (N.D. W. Va. August 20, 2025) (same).

Because the Five-Year Rule as applied to JUCO players limits the number of years they can participate in the competitive college football services labor market and earn compensation (both NIL and direct compensation), this Court finds the Rule is commercial and falls under the purview of the Sherman Act. To the extent the NCAA continues to insist that there should be an antitrust exemption to its eligibility rules as preserving the unique nature of collegiate sports, the Court finds this insistence echoes the already rejected claim that "because of the special characteristics of its particular industry [the NCAA] should be exempt from the usual operation of antitrust laws," and reiterates the Supreme Court's instruction that such an appeal is "properly addressed to Congress." <u>Alston</u>, 594 U.S. at 97 (citations omitted). Moreover, and most importantly, the Court further rejects the notion that the product that the NCAA is offering—competitive college athletic sports events—is unique because the athletes are unpaid amateurs. They are not. This is now a labor market with compensated workers.

*///*

### ii. *The Relevant Market*

Before turning to the three-step rule of reason analysis, a court "must first define the relevant market." American Express, 585 U.S. at 542. "[T]he relevant market is defined as the area of effective competition," *i.e.*, the "arena within which significant substitution in consumption or production occurs." Id. at 543 (cleaned up). Antitrust law requires the definition of both a product market and a geographic market. See Newcal Indus., Inc., v. Ikon Off. Sol., 513 F.3d 1038, 1045 n.4 (9th Cir. 2008). The Court finds Martinson has defined two relevant markets within the United States: the input labor market for competitive college football services and the output product market for competitive college football events. As the primary alleged antitrust injury arises from the monopsony of the NCAA in the input market, the Court's analysis focuses on that market.

A monopsony is a market structure where a firm has concentrated market power on the buyer side of the input market. See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 320 (2007), United States v. Syufy Enterprises, 903 F.2d 659, 663 n.4 (9th Cir. 1990) ("[m]onopsony is a market situation in which there is a single buyer ... monopsony and monopsony power are the general equivalent on the buying side of monopoly and monopoly power on the selling side."); see also Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991). Here, the NCAA has exclusive power over the buyer side of the market for competitive football players' athletic services. Indeed, in Alston, the Supreme Court observed that "[t]he NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition . . . Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor." 594 U.S. at 89-90. Post-Alston, that the NCAA has monopsony power over the labor market for competitive student-athletes' services has only become more uncontestable, given the fact that NCAA Division I sports accounts for over 99% of NIL opportunities, and, as of July 1, 2025, NCAA members now compete to recruit athletes with *direct* compensation. Within this exclusive market, Division I

institutions are simultaneously colluders and competitors acting in concert through the NCAA, which has the "sole ability to dictate the rules and regulations for participation." <u>Ohio v. Natl. Collegiate Athletic Assn.</u>, 706 F. Supp. 3d 583, 592 (N.D. W.Va. 2023).

The Court thus defines the relevant market as the nationwide labor market for competitive college football services. The Court finds that within this market there is no doubt or dispute that the NCAA exercises complete monopsony power to set the rules that determine both input and output—including the price of a football player's labor.[4] <u>See</u> <u>Braham</u>, No. 3:25-CV-00253-MMD-CSD, 2025 WL 2017162 at *5-6; <u>see also</u> <u>Pavia</u>, 760 F.Supp.3d at 540. Given the NCAA's monopsony power and the fact that the challenged bylaws are horizontal agreements among NCAA members who compete for and collude regarding student-athletes' labor, the Court is not persuaded by the NCAA's insistence that expert analysis is necessary to properly define the market in this case. <u>See</u> <u>American Express.</u>, 585 U.S. at 543, n.7 (horizontal agreements between competitors not to compete in some way do not require a precise market definition for a court to conclude that such agreements are anticompetitive).

Similarly, the Court finds the NCAA's suggestion that JUCOs or the NFL are potential substitute buyers or competitors that should be included in the analysis of market power is a thinly veiled attempt to deflect from its undisputed market dominance in the relevant labor market. It is beyond dispute that in the labor market for competitive college football services the NCAA maintains an almost total monopsony in terms of its market dominance. Junior colleges (and other non-NCAA college institutions) are not competitors in any sense in this market. Moreover, the NCAA's assertions regarding the NFL (and JUCO's) are directly contradicted by

---

[4] NCAA argues the Court should not hold it to its admission in <u>Alston</u> that it exercises monopsony power in the market of Division I sports, because by admitting rather than contesting its market power in <u>Alston</u>, the issue was not "actually litigated" for purposes of *res judicata*. ECF No. 14 at 13. But for purposes of issue preclusion, there is no distinction between a final judgement based on a party's concession or failure to prove an issue, versus a decision on the merits of that issue. <u>See e.g.</u>, <u>Los Angeles Unified Sch. Dist. v. Los Angeles Branch NAACP</u>, 714 F.2d 935, 941 (9th Cir. 1983), on reh'g, 750 F.2d 731 (9th Cir. 1984). And in any case, at the hearing on the instant Motion, counsel for the NCAA conceded and the Court finds that within the labor market for competitive college football services, the NCAA has monopsony power.

1    the NCAA's own claim that Division I athletics are a unique product that must be preserved as
2    distinct from both JUCO and NFL athletics.

3    ### iii.  *The Rule of Reason*

4    The Court next turns to the three-step burden shifting framework of the Rule of Reason,
5    which the parties agree is the framework for the antitrust analysis here. The Court notes that the
6    NCAA's bylaws, as horizontal restraints on competition exerted by a monopsonist, would, in
7    another labor market, be rejected as *per se* unlawful. See Business Elec. Corp. v. Sharp. Elec.
8    Corp., 485 U.S. 717, 730 (1988) (explaining that horizontal agreements are agreements between
9    competitors at the same level in a particular industry); see also Nat'l Collegiate Athletic Ass'n v.
10   Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 99-100 (1984) (observing horizontal
11   agreements among competitors in the same market are ordinarily considered *per se* unlawful).
12   However, the Supreme Court has instructed that a burden-shifting analysis is warranted within
13   sports competition as "an industry in which some horizontal restraints on competition are
14   essential if the product is to be available at all." Alston, 594 U.S. at 91 (citing Board of Regents,
15   468 U.S. at 94.[5]

16   ### 1.  Substantial Anticompetitive Effect

17   First, the Court finds that Martinson has met his burden to establish that the Five-Year
18   Rule has a substantial anticompetitive effect on the labor market for competitive college football
19   services. A plaintiff can demonstrate anticompetitive effect either directly, through proof of
20   actual harm on competition such as reduced output, increased prices, or decreased quality, or
21   indirectly, such as through "proof of market power plus some evidence that the challenged
22   restraint harms competition." American Express, 585 U.S. at 542 (citations omitted). In the labor
23   market context, antitrust harm from monopsony power may be demonstrated in a few ways,
24   including restraints on individuals' ability to move freely between positions with different
25   employers or restrictions on their ability to compete for positions within their area of knowledge

26   _____
27   [5] The Court notes here that the Supreme Court's direction in Alston as to the appropriate standard to apply to the antitrust analysis of college sports clearly predates the recent NCAA decision to fundamentally alter the relevant input and output markets by allowing colleges to pay
28   students directly for their athletic services.

or expertise. See Deslandes v. McDonald's USA, LLC, 81 F.4th 699, 702 (7th Cir. 2023), cert. denied, 144 S. Ct. 1057 (2024) (no-poach clauses in the monopsony context violate the antitrust laws when they "hold[] down the price of labor by reducing competition for fast-food workers" despite downstream benefits to consumers). In Deslandes, the Seventh Circuit held no-poach clauses in McDonald's franchise agreements, as horizontal agreements which prevent workers at one franchise outlet from taking higher-paying offers at other franchise or corporate outlets, could constitute a *per se* antitrust violation based on the harm of "prevent[ing] workers from reaping the gains from skills they learned by agreeing to work at lower wages at the outset of their employment." Id. at 703-705.

Antitrust harm from a monopsony in a particular labor market may also be demonstrated by underemployment, nonemployment or wage suppression. See e.g., U.S. Office of the President Council of Econ. Advisers, Issue Brief, Labor Market Monopsony: Trends, Consequences, and Policy Responses, (Oct. 2016) ("Economic theory shows that firms with monopsony power have an incentive to employ fewer workers at a lower wage than they would in a competitive labor market."); Eric A. Posner, Suresh Naidu, & Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 536, 558 (2018) (Explaining that harms from monopsonies in labor market include "lower wages" and "increased unemployment or nonemployment").

Given the NCAA's uncontested monopsony power and the fact that the Five-Year Rule amounts to a horizontal agreement among member institutions competing for athletic talent to exclude a class of otherwise qualified and sought after athletes like Martinson, a quick look analysis under the rule of reason is sufficient for this Court to conclude it has a substantial anticompetitive effect. See Pavia, 760 F.Supp.3d at 539–40  (holding that plaintiff demonstrated a "likelihood that the challenged restraints have a substantial anticompetitive effect"); Braham, 2025 WL 2017162, at *6 (holding the Five-Year Rule harms competition in the relevant market by excluding a qualified cohort–namely, JUCO athletes); Elad, 2025 WL 1202014 at *8 (finding the JUCO Rule has a substantial effect on the labor market for college football).

The Court finds that the challenged bylaws are "essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics" to exclude JUCO athletes from competing for four seasons within that market—and in that sense are "an even more direct restraint on trade" than the compensation rules addressed in Alston. See Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F.Supp.3d at 591. It is obvious that "restrictions on who can compete (earn NIL compensation) and for how long necessarily have anticompetitive effects," and even more obvious now that the Five-Year Rule limits who can be *directly* paid by Division I members institutions. See e.g., Pavia, 760 F.Supp.3d at 540. This Rule creates recognized antitrust harms as noted above in the form of underemployment due to the categorical exclusion of otherwise qualified workers from the relevant labor market by a monopsonist (the NCAA) in the market. The exclusion of these otherwise qualified workers leads to the further and additional antitrust harm of reduced labor market competition. Thus, Martinson has shown that the Five-Year Rule is a restraint that harms competition by limiting the amount of time that JUCO athletes can participate in the labor market for competitive athletic football services and be compensated for their participation in the market. This is not a speculative harm—Martinson himself has lost an NIL deal for a video game solely due to his ineligibility for the 2025-2026 season, due to the Five-Year Rule.

The Court finds the antitrust harm and anticompetitive effects of the Rule are evidenced by the details of Martinson's case. UNLV (a firm within the labor market) sought the services of Martinson and attempted to offer him access to resources and benefits in exchange for his services. UNLV was initially (would be but for this order) prevented from 'hiring' Martinson by the horizontal agreements (the NCAA Rules) in the labor market. In fact, UNLV sought to obtain a waiver on behalf of Martinson and has offered him an athletic scholarship to complete a master's degree which he stood to lose due to the Five-Year Rule. UNLV's efforts and offer demonstrate that Martinson, and JUCO athletes like him, are qualified, in-demand athletes who are eligible to receive compensation for their services. Their services and their addition to the competition within the labor market is prevented by the Rule. And the NCAA's assertion that the Five-Year Rule has a neutral effect because disqualified athletes are simply replaced by eligible

ones, requires an assumption that all football players in all positions are purely fungible and would be compensated the same simply based upon the roster position they occupied—an assumption that is clearly disproven by this case. If market actors, such as UNLV, believed these individuals' services to be fungible, they would not seek waivers and hold open offers. Based on all of these factors, the Court thus concludes that this Rule results in an anticompetitive distortion of the labor market for competitive college football services.

The Court rejects the NCAA's argument that no anticompetitive effect exists because only a single individual faces economic harm. The NCAA and courts who have found in its favor in similar challenges to the JUCO eligibility rules assert that the rules only harm the plaintiff, and "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812 (9th Cir. 1988). However, the Rule does not harm one individual based upon a characteristic or qualification unique to that individual. Rather, the Rule by its own language is categorical and not specific. It affects a category of otherwise qualified athletes (workers) who are excluded based upon their belonging to that category as JUCO athletes. Accordingly, the Court finds Martinson's exclusion from the market for the upcoming season constitutes an antitrust harm and finds that only a "quick look" or "twinkling of an eye" is necessary to conclude he will likely succeed in establishing the Five-Year Rule has a substantial anticompetitive effect on the labor market for competitive college football services as it reduces

### 2.    Procompetitive Justifications

In Alston, the Supreme court recognized "coordination between competitors within sports leagues can be procompetitive." Alston, 594 U.S. at 90. That is because "the very competitions that consumers value would not be possible" without agreed-upon rules. Id. However, the Court finds the NCAA has not articulated a procompetitive justification for the Five-Year Rule. The NCAA asserts that the Five-Year rule has "undeniable procompetitive effects, including (1) preserving college athletics as a unique product that is differentiated from professional sports; (2) expanding opportunities for prospective and current student-athletes; and (2) better aligning athletics and academics." ECF No. 14 at p. 19. The Court addresses each justification in turn.

Regarding the first proffered procompetitive effect, the Court finds NCAA has provided no evidence that consumers of competitive college football events consider it to be a "unique product" based on its differentiation from competitive sports thanks to the Five-Year Rule. And even if the Court were to accept this theoretical proposition, construing the harm to student-athletes as a benefit to consumers does not justify the antitrust harm in the relevant labor market based upon the exclusion of certain otherwise qualified workers—JUCO athletes. See e.g., Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F.Supp.3d at 591 ("As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach 'treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing).'") (quoting Deslandes, 81 F.4th at 703). Moreover, this justification is merely a reassertion of the NCAA's claim that that its restraints on trade are necessary to preserve the "amateurism model" of collegiate sports, which courts, including the district court in Alston, have repeatedly found is not consistently defined by the NCAA, and is belied by the fact that the challenged rules are adopted without any reference to "considerations of consumer demand." In re Natl. Collegiate Athletic Assn. Athletic Grant-in-Aid Cap Antitrust Litig., 375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019), aff'd, 958 F.3d 1239 (9th Cir. 2020), aff'd sub nom. Alston, 594 U.S. 69 (2021). And now that Division I members will compensate student-athletes for their services directly, appeals to the "amateurism" model are obviously untenable.

Further, this Court agrees that other exceptions to the Five-Year Rule which allow a student-athlete to compete at advanced ages with far more physical maturity and experience than a typical undergraduate college student, including exceptions for military service and professional careers in other sports, show that the "unique" and "differentiated product" justification for the Five-Year Rule does not hold water. See e.g., Braham, 2025 WL 2017162, at *7 (holding the NCAA's unique and differentiated product justification "runs counter to the NCAA's other exceptions to its Five-Year Rule that allow for older students to join after prep school, military service, and/or religious obligations."); see also Elad, 2025 WL 1202014, at *9 (holding the differentiated product of 'younger, less experienced' athletes justification is

inconsistent with its exceptions to the Five-Year Rule for older students); Pavia, 760 F.Supp.3d at 542 (finding the exceptions given to "other student-athletes with comparable or more post-secondary experience" rendered the supposed justification for the eligibility rules as necessary to "prevent age and experience disparities and preserve the quality of the experience" unconvincing).

The second claimed justification of "expanding opportunities" for prospective and current student-athletes fails for a few reasons. First, this justification runs afoul of the basic economic principle that greater competition in a labor market generally leads to better outcomes for workers. See generally, U.S. Office of the President Council of Econ. Advisers, Issue Brief, Labor Market Monopsony: Trends, Consequences, and Policy Responses (Oct. 2016) (explaining that unimpeded competition by employers for workers leads to the best outcomes for workers in the labor market). Second, the concern that JUCO athletes will crowd out less experienced incoming freshman is not assuaged by the Five-Year Rule given that the NCAA allows member institutions to use a transfer portal and thereby opt for more experienced players. Moreover, this justification is facially not procompetitive—rather it suggests the NCAA is attempting to artificially 'even the playing field' to ensure student-athletes who are likely less experienced and less desirable to Division I institutions have more opportunities to participate in the labor market. Such an artificial restriction or impediment on competition in the labor market leads to lower wages for all workers. Id. While there may be a myriad of noneconomic reasons to 'even the playing field,' that does not render the justification procompetitive. Whether a restraint of trade may "serve some social good more important than competition" is irrelevant to antitrust analysis because the "statutory policy of the Act is one of competition and it precludes inquiry into the question whether competition is good or bad." Alston, 594 U.S at 94.

The Court also rejects the NCAA's third justification for its Rule. The NCAA claims the five-year rule is designed to ensure that a student-athlete's career temporally aligns with the time it takes to obtain a baccalaureate degree at a member institution. But that is inconsistent with the fact that student-athletes obtaining a graduate degree are eligible to compete in Division I athletics. And given how the eligibility duration has transformed over time, the Court agrees with

the <u>Pavia</u> court's finding that this justification appears pretextual. <u>See Pavia</u>, 760 F.Supp.3d at 542-43 (holding the natural and standard degree progression justification for the five-year rule was pretextual given how Division I football players can "red shirt" up to four games per season without losing a year of eligibility and redshirt all post-season competition). And again, the NCAA does not explain why this justification, although it may reflect the goal of achieving the "social good" of ensuring student-athletes move on from college after five years, is procompetitive within the labor market for purposes of antitrust analysis.

### 3.  Less Anticompetitive Means

Even if the Court accepted the NCAA's proffered justifications as procompetitive (which it does not), the Court finds that Martinson's proposed alternatives can achieve such procompetitive effects with less anticompetitive means. First, as the district court in <u>Ohio v. NCAA</u> found in invalidating the NCAA's one-year exclusion of transfer students from Division I competition under Section I of the Antitrust Act, "both the academic and amateurism goals of the NCAA, to the extent they can be discerned, are accomplished through less restrictive alternatives already in place within NCAA bylaws." 706 F.Supp. 3d at 596-97 (referencing Bylaw 14.4.1, which requires student-athletes to maintain progress toward a degree at the institution where they compete, Bylaw 20.2.4.12, which requires member institutions to publish their progress-toward-degree requirements, and other bylaws that require minimum credit hour and grade point averages for eligibility). Further, the alternative of defining intercollegiate competition to include only competition at institutions that are members of the NCAA—which JUCOs are not—such that the five-year clock would not begin ticking until a student-athlete enrolls at a member institution avoids the anticompetitive and arbitrary disparate treatment of JUCOs. <u>See Braham</u>, 2025 WL 201716 at *7-8.

In conclusion, this Court finds the Five-Year Rule is likely unlawful under the Rule of Reason.

### D.  Irreparable Harm

A plaintiff must prove a likelihood of irreparable harm in the absence of preliminary relief. <u>See Winter</u>, 555 U.S. at 20. Irreparable harm is proven by demonstrating "immediate

threatened injury." <u>See e.g.</u>, <u>Caribbean Marine Servs. Co. v. Baldrige</u>, 844 F.2d 668, 675 (9th Cir. 1988) (citation omitted) (denying preliminary injunctive relief where "liability [was] too remote and speculative to constitute an irreparable harm"). The Court finds Martinson stands to suffer immediate and irreparable harm by being disqualified from the 2025-2026 season. In so concluding, the Court agrees with many others that have found that a student-athlete's loss of opportunity to play sports is irreparable. <u>See e.g.</u>, <u>Ohio v. Nat'l Collegiate Athletic Ass'n</u>, 706 F.Supp.3d at 597 (collecting cases); <u>Pavia</u>, 760 F.Supp.3d at 544. Further, Martinson has already lost out on NIL compensation for a video game due to his disqualification. While the NCAA argues this loss is not irreparable since it can be quantified and compensated monetarily, that ignores the loss of the opportunity to "market one's name and likeness and showcase abilities to future employers" that cannot be estimated or quantified. <u>Braham</u>, WL 2017162 at *9 (citations omitted). Similarly, he attests that he will lose an academic scholarship to obtain a master's degree in the absence of the requested injunctive relief. The loss of such an educational opportunity and experience at this stage in his life likewise cannot be quantified by this Court. <u>See Arizona Dream Act Coalition</u>, 757 F.3d at 1068 (holding the loss of opportunity to pursue one's chosen profession, particularly early in life, may constitute irreparable injury).

The Court also finds any delay by Martinson in seeking the instant injunction was both minimal and reasonable under the circumstances and does not warrant a finding that Martinson will not face irreparable harm. While a "plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm," <u>Oakland Trib., Inc. v. Chron. Pub. Co., Inc.</u>, 762 F.2d 1374, 1377 (9th Cir. 1985), "delay by itself is not a determinative factor in whether the grant of interim relief is just and proper." <u>Cuviello v. City of Vallejo</u>, 944 F.3d 816, 833 (9th Cir. 2019) (alterations in original) (citation and quotation marks omitted). "Usually, delay is but a single factor to consider in evaluating irreparable injury; indeed, courts are loath to withhold relief *solely on that ground*." <u>Id.</u> (emphasis in original) (quotation marks omitted). Here, Martinson brought the instant suit and motion within two weeks of the NCAA's denial of UNLV's appeal of its waiver request on his behalf. That is not the kind of unjustified or lengthy delay that would warrant denying relief under the circumstances.

**E.  Balance of the Equities and the Public Interest**

The Court considers the balance of the equities and public interest together. "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." Univ. of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court must then weigh "the hardships of each party against one another." Id. As to public interest, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24.

The NCAA argues granting the relief requested would adversely impact the decisions and collegiate careers of other student-athletes, who will purportedly have their roster slots displaced by Martinson and other JUCO student-athletes. The Court finds this argument is misguided and fails to address the essence of the antitrust harm at issue: the reduced participation in the competition in the relevant labor market arising from the differential treatment of JUCO student-athletes under the Five-Year Rule. By preventing this anticompetitive harm, enjoining the NCAA from enforcing the Five-Year Rule as to Martinson for next season will not result in substantial harm to others as the harm derives from limiting rather than increasing competition for athletic services within the market. See also Pavia, 760 F.Supp.3d at 544 (holding that enjoined enforcement of the Intercollegiate Competition Rule as to the plaintiff would not cause "substantial harm" to others or to the NCAA); Braham, WL 2017162 at *9 (same). Moreover, the NCAA has not articulated any harm it will suffer—it only asserts speculative harm to other potential DI student-athletes. But in contrast to the NCAA, Martinson, will suffer immediate and irreparable harm in the absence of relief as discussed above. See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 765 (9th Cir. 2014) (holding the balance of equities tipped in favor of the plaintiff where the plaintiff's harm in the absence of the injunction was permanent, whereas the harm to the defendant of a wrongful injunction was temporary).

Further, the Court agrees with Martinson and other courts that enjoining the anticompetitive eligibility rules serves the compelling public interest of promoting increased

participation and competition in the competitive college football services labor market. See e.g., Braham, WL 2017162 at *10; Pavia, 760 F.Supp.3d at 544 (holding that the "public interest is served by promoting free and fair competition in labor markets"); see also Ohio v. Nat'l Collegiate Athletic Ass'n., 706 F.Supp.3d at 600 (injunctive relief "serve the public interest in promoting free and fair competition in labor markets guaranteed by antitrust laws"); see also Williams v. Nat'l Collegiate Athletic Ass'n, No. CV24614ZNQJBD, 2024 WL 397760 at *3 (D.N.J. Feb. 2, 2024) ("Free and fair competition in the labor markets is essential to the American economy").

### F.  The Rule of Restitution

Martinson also asks this Court to enjoin the NCAA's Rule of Restitution. The Court finds that for the relief granted here to be meaningful, the NCAA must be prevented from punishing Martinson (whether directly or indirectly by punishing any institution Martinson competes for) for obtaining it or otherwise attempting to inhibit student-athletes from accessing the courts. See Ohio v. Nat'l Collegiate Athletic Ass'n, F.Supp.3d at 600-602 ("The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts."); see also Pavia, 760 F.Supp.3d at 545 (enjoining the NCAA from enforcing the Rule of Restitution); Elad, 2025 WL 1202014, at *10–11 (same); Braham, 2025 WL 2017162, at *10 (same).

### G.  Bond

Federal Rule of Civil Procedure 65(c) provides, in pertinent part: "The court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Martinson maintains the NCAA will suffer no costs or damages because of this injunction, even if ultimately found to have been wrongful, and the NCAA does not suggest otherwise. Accordingly, the Court finds no bond is necessary in this instance.

///

///

///

## VI.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** the (ECF No. 8) Motion for a Preliminary Injunction is **GRANTED**. Pending a final decision on the merits, the NCAA is enjoined from (1) enforcing the Five-Year Rule as it applies to Plaintiffs time at junior college in connection with his eligibility for the 2025-2026 football season; (2) applying the Rule of Restitution or any other rule or sanction to punish Plaintiff Martinson, UNLV, or any NCAA member institution to which he commits.

**IT IS FURTHER ORDERED** that the (ECF No. 23) and (ECF No. 25) Motions for Leave to File Supplemental Authority are **GRANTED**.

**DATED:** September 18, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**